UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Jay E. Glenewinkel et. al. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 3:20-cv-02256B |
| v. | § | |
| | § | |
| Carvajal et. al, | § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

## FIRST AMENDED COMPLAINT

1.      Plaintiffs Jay E. Glenewinkel, Brian Mattes, Timothy J. Benz, Joshua N. Higgins, Ronald C. Dean, Jason Trott, Ryan E. Offineer, William Cashel, and other similarly situated individuals (collectively "Plaintiffs"), by and through their attorneys, ELLWANGER LAW LLLP, bring this action for damages and other legal and equitable relief from Defendants, Michael Carvajal, Federal Bureau of Prisons Director,  Jeffery D. Allen, Federal Bureau of Prisons Medical Director, M. Bayless, A. Jenkins, K. Zook, and  L. Smith (collectively "Defendants") for violations of the Eight Amendment to the United States Constitution.

## INTRODUCTION

2.      Jay E. Glenewinkel et. al. and on behalf of similarly situated inmates at the Federal Correctional Institution ("FCI") in Seagoville, Texas ("FCI Seagoville") bring this lawsuit to bring light to the horrific, inhumane, and deadly effects of the Bureau of Prisons' carelessness toward the COVID-19 crisis within FCI Seagoville. Plaintiffs allege that the Defendants have been deliberately indifferent by failing to adequately prepare and implement safeguards and screening protocols in which to protect the inmate population, and particularly individuals with disabilities,

from the harms caused by the COVID-19 virus, in violation of the Eighth Amendment to the United States Constitution.

3.      In particular, Plaintiffs allege that Defendants showed deliberate indifference to the Seagoville inmate population's Constitutional rights by:

- Failing to provide immediate and/or adequate medical care to inmates who complained of symptoms and/or pains.

- Failing to adopt and implement policies and procedures to prevent and mitigate the spread of COVID-19 remotely consistent with Center for Disease Control guidelines.

- Imposing further harm and mental/physical stress to infected inmates through forced moves from housing unit to housing unit, further exasperating those inmates who were already sick.

- Forcing inmates into extremely crowed situations, such as town hall meetings, long meal lines, etc., eliminating inmates' ability to maintain social distancing and to exercise any recovery efforts.

- Staff not wearing proper PPE when working in close proximity of the inmates.

- Issuing blanket denials of compassionate release/home confinement requests by using the wrong guidelines and in direct opposition to the expressed policies of the Department of Justice.

<u>**JURISDICTION AND VENUE**</u>

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress

providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) 42 U.S.C.A. § 1983.

5.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

6.      Plaintiffs Jay E. Glenewinkel, Brian Mattes, Timothy J. Benz, Joshua N. Higgins, Ronald C. Dean, Jason Trott, Ryan E. Offineer, and William Cashel were all incarcerated at the FCI Seagoville during the events described in this complaint.

7.      Defendant M.D. Carvajal is the current Director of the Bureau of Prisons ("BOP") and is in charge of and responsible for the safety and health of all federal prisoners at all BOP facilities.

8.      Defendant Jeffery D. Allen is the current Medical Director of the BOP.

9.      Defendant K. Zook is the current warden at FCI Seagoville and is in charge of operations as well as the safety and personal health of all inmates at this facility.

10.     Defendant M. Bayless is currently an Associate Warden at FCI Seagoville.

11.     Defendant A. Jenkins is currently an Associate Warden at FCI Seagoville.

12.     Defendant L. Smith is currently the acting Captain of FCI Seagoville.

13.     All defendants and their staff have acted, and continue to act, under color of federal law and in violation of the U.S. Constitution.

**FIRST AMENDED COMPLAINT**

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. Plaintiffs have made every effort to exhaust any remedies available to inmates. Named Plaintiffs have submitted internal complaints to the warden, all of which have been ignored or issued blanket denials.

## STATEMENT OF FACTS

15. World Health Organization declared COVID-19 a pandemic on March 11, 2020.

16. President Trump declared a national emergency for the U.S. because of COVID-19 on March 13, 2020.

17. The first confirmed case of COVID-19 in Dallas County was reported on March 10, 2020.

18. Despite early warnings, Defendants did little to make any necessary preparations for a possible outbreak. Few supplies were brought in and little guidance, aside from outside news sources, was available to the inmate population.

19. On April 1, 2020, the BOP implemented a mandatory fourteen-day nation-wide lockdown. The term "lockdown" means inmates are to be confined to their quarters. However, some inmate food service and compound trash workers were called for duty and worked during a majority of the lockdown.

20. On April 15, 2020, while BOP had confirmed that 446 inmates and 248 staff had tested positive "bureau-wide," Seagoville staff began to shuffle inmates around from F10 housing units to other housing units, to "set up quarantine housing." Though many inmates were moved to housing units E6 and C7, based on those inmates work assignments so the UNICOR workers could return to work. During this move, Plaintiffs observed that most of the staff, including the warden, were not wearing any form of PPE to reasonably protect themselves or the inmate population

**FIRST AMENDED COMPLAINT**

4

21.    Around this time period, inmates going to pill line were starting to complain to prison staff that they could not taste anything or smell anything, as well as a myriad of other COVID-19 like symptoms. However, these complaints were ignored altogether by Seagoville medical staff. There was still no testing being done on any inmates at this time or any protective measures taken to ensure the inmate population's health.

20.    To illustrate some of the most dangerous practices of the prison staff, during the second and third weekend of the lockdown, recreation Officer Boykin implemented a Bingo game for all housing units. In administering this game, with the aid of other staff and inmate workers, Officer Boykin would pass out the bingo cards, call out the numbers while exposing his mouth and nose, and pass out prize bags. He would perform these bingo games in each of the housing units while being a potential carrier of the COVID-19 virus and taking no steps to prevent the spread of COVID-19.

21.    Mid to late April 2020, lockdown restrictions were eased to a "modified" operations standard. At this time, inmates began reporting to the dining hall to pick-up their lunch trays and dinner bags. On several occasions, various food service staff employees were observed handling inmate food without wearing gloves or face masks.

22.    On April 30, 2020, the BOP confirmed that there were 1692 inmates and 349 staff that had tested positive bureau-wide. On May 1, 2020, over 600 inmates at Terminal Island had tested positive. At about the same time, Dallas County was beginning to see significant increases in the number of confirmed cases and deaths. Despite the geographical proximity of the Dallas County outbreak, Warden Zook, et. al., continued to take a dismissive attitude to the increased threat of staff exposure outside the prison fences. Despite increased requests for testing by inmates, these requests continued to be denied.

**FIRST AMENDED COMPLAINT**

5

23.    By mid-May 2020, the COVID-19 virus was running rampant throughout various BOP facilities, as well as the rest of the country. Dallas County had over 4,000 confirmed cases with over 200 deaths at that time. Fort Worth FMC had over 400 inmates test positive while FMC Carswell had reported over 200 cases. Both Fort Worth and Carswell had reported deaths of BOP inmates at that time. Still executive staff at Seagoville continued a semi-normal routine under the assumption that Seagoville was under an "immunity bubble," stating to inmates repeatedly that there were not any COVID-19 cases on the compound despite the obvious cases amongst the inmate population.

24.    As the number of infections and deaths continued to increase at FMC Fort Worth, several officers from Seagoville were sent to assist at Fort Worth, often splitting weekly shifts between Seagoville and Forth Worth and acting as carriers for the virus between the two facilities. Though this practice eventually ceased, the significant threat of inducing harm to the Seagoville population remained and nothing was done to limit or remedy the impact of this obvious danger. Since testing for COVID-19 was not, and still is not mandatory for Seagoville officers, it is not known how many officers might have been carriers of the virus. Seagoville executive staff neither want nor care to know.

25.    On May 29, 2020, the BOP implemented another national "full lockdown" in response to the protests taking place all over the nation following the murder of George Floyd. Around 5:30 p.m. on May 29th, the 180 or so inmates from housing unit A5 were called to go to the dining hall to pick up dinner trays. While en route to the dining hall, the inmates from unit A5 were stopped near unit C7 so that executive staff could conduct a "town hall" meeting to explain the protests and riots. Inmate Footes of A5 unit asked Associate Warden A. Jenkins, "When are we going to get tested for the virus?" The response from both A.W. Jenkins and Warden Zook was

**FIRST AMENDED COMPLAINT**

6

"there will not be any testing for inmates. The COVID-19 is not here, and it's not going to be here!" At that point, staff moved on to other buildings for more town hall meetings, where other inmates asked the same question and got the same response.

26.    The following week, protest-related restrictions were lifted and inmates were allowed to go to recreation for a limited time in a pre-scheduled time slot. Inmate work details were once again running, with inmates from multiple units working together on various projects and assignments. During this time, neither the inmates nor the staff, some of whom had assisted at Fort Worth, wore face masks. The rule requiring them was not enforced.

27.    During this same period, protests were continuing, and several officers from Seagoville participated in policing the Dallas protests. Likewise, the case manager from unit A5, along with others attended the President Trump rally in Tulsa, Oklahoma, a widely known "superspreader" event where no precautions were taken against COVID-19. These officers were part of large gatherings and were exposed to the virus but took no action to prevent the captive inmate population that was forced to be exposed. These officers then returned to work and were frequently in close proximity with numerous inmates. Shortly thereafter, these same officers complained of and were showing obvious signs of illness related to COVID-19, having harmed innumerable inmates through exposure.

28.    Throughout June, many officers still refused to wear PPE while working with inmate work crews, UNICOR, facilities, commissary, recreation, and compound trash orderlies who resumed a modified, but somewhat routine, work schedule.

29.    By early June, more and more inmates began complaining of having symptoms, while other inmates had fallen extremely ill. Testing and other screening methods for COVID-19 were completely denied when requested. And still, the warden and her staff continuously held a

**FIRST AMENDED COMPLAINT**

7

line of deliberate indifference to the virus ravaging the inmate population, saying "the COVID-19 virus is not here at Seagoville" and refusing to test inmates or staff.

30. On the morning of June 25, 2020, three inmates from unit A5 went to medical and demanded to be tested for COVID-19. At first, medical tried to refuse the screening again, but the inmates insisted on being tested. All three tested positive.

31. By 11:30 a.m. on June 25, 2020, work details were recalled and the compound was placed in total lockdown. On duty for unit A5 that day was Officer Irvin, who helped police the Dallas protests, and Case Manager Acquire, who attended the Tulsa Trump rally. Both were working despite being sick that day.

32. On June 26, 2020, testing for the entire population of unit A5 was conducted. Test results would take five to seven days to be returned.

33. It should be noted that A5 did not have air conditioning. This means that inmates suffering from the horrific fevers, sweats, difficulty breathing, and other respiratory issues associated with COVID-19 infection were suffering in temperatures above 100 degrees, without air circulation, and without any treatment.

34. On June 30, 2020, the inmates in A5 were each given a large Army-style duffle bag and told to pack all of their property.

35. On July 1, 2020, the test results came in. Of the 112 inmates in A5, 61 inmates tested positive. The remaining 51 inmates who tested negative were moved to unit F10 in an attempt to separate the negative inmates from the positive inmates.

36. It should be noted that F10 also does not normally have air conditioning, but a week prior, a portable non-filtered a/c unit was installed. Upon information and belief, F10 has asbestos in the floor tiles that has not yet been removed.

**FIRST AMENDED COMPLAINT**

8

37.     On the evening of July 2, 2020, executive staff attempted to move 14 inmates from another housing unit into F10 with the negative inmates. These 14 inmates had been tested, but test results had not yet returned. This forced a serious push back amongst the inmates against the executive staff because the inmates were reasonably concerned about being potentially exposed to this deadly virus. During this incident, A.W. Bayless stated, reflecting the prison's indifference to the immense harm being done, that "COVID-19 is not an airborne virus." In the end, those 14 inmates were relocated to the auditorium.

38.     On July 3, 2020, inmates from Unit 12 integrated with the negative inmates from unit A5. These inmates from unit 12 were awaiting test results.

39.     From July 4th through July 14th, executive staff continued to move inmates awaiting test results into blocks with inmates that had tested positive without reason nor systems for keeping track of who was showing symptoms. The physical and mental stress of the situation, in combination with inmates being moved around constantly in extreme heat and humidity, added to the pain and suffering of many inmates, as the healthy started sickening and the sick got sicker.

40.     On July 15, 2020, all the inmates of unit F10 were given a rapid test, including the eight named plaintiffs. This time, the results came back positive. Plaintiffs Jay Glenewinkel and Ronald Dean along with 12 other inmates were moved from F10 to the auditorium, only to move back to F10 the very next day, when F10 building was "flipped" to a positive unit.

41.     On July 16, 2020, Plaintiff Ryan Offineer was moved from F10 to the auditorium and returned to F10, the positive unit, when Mr. Offineer himself had NOT tested positive.

42.     Between July 1st and July 24, 2020, while still in F10 the Plaintiffs and other inmates witnessed on a daily basis inmates being carted off to medical while others were loaded into ambulances and taken to hospitals.

43.     Throughout July 2020, when staff, including executive staff, made rounds to do temperature checks, twice daily, or stand-up counts, three times daily, they did not wear gloves, eye protection, or protective clothing, despite knowing that the virus could be transmitted through the eyes and skin as well as through the nose and mouth. This staff unnecessarily exposed scores of inmates without any reason other than deliberate indifference to the harm they were doing.

44.     Several times per week, mandatory town hall meetings were conducted where over 100 or more inmates were crowded into a very small area to listen to speeches. Anytime staff spoke to the inmates, they would uncover their mouths and noses. These meetings further contaminated the air, further increasing the concentration of COVID-19 in the air.

45.     Dozens of inmates from all of the housing units were getting sick and complaining of coughs, headaches, chest pains, and other symptoms. In most of their cases, when inmates voiced their complaints, the medical and/or prison staff ignored or dismissed them. In one instance, a nurse was making rounds, "checking" to make sure everyone was alright. When an inmate complained to the nurse about being dizzy and having chest pains, the nurse rudely replied, "What do you want me to do about it?"

46.     On July 22, 2020, there were 8 inmate medical emergencies and 5 more inmates were transported to hospitals. Several officers had also fallen ill. On July 23, 2020, Officer Peterson stated, "it's worse than yesterday." Officer Peterson also stated that some Officers were being forced to work while sick.

47.     From June 25, 2020, through July 29, 2020, over 1300 inmates at FCI Seagoville tested positive for the Covid-19 virus. That is more than 95% of the inmate population. BOP leadership was completely indifferent to the immense harm their inaction and poor response to the

**FIRST AMENDED COMPLAINT**

10

COVID-19 crisis caused. Aside from constantly shuffling inmates around, Seagoville executive staff had no conceivable plan to mitigate the spread of COVID-19.

48.     In addition, PPE provided to inmates and staff was faulty and/or inadequate, and the cleaning supplies are so diluted that sanitation efforts are ineffective.

49.     FCI Seagoville is extremely overcrowded, and in dorm-style housing, making isolation impossible. The infected inmates cannot fully recover because the contaminates from the virus have nowhere to go. Therefore, it has been constantly around inmates in all of the housing units.

50.     Inmates at Seagoville continue to remain in danger of enduring detrimental and catastrophic health consequences since nearly everyone is now infected with the virus. At a town hall meeting on July 24, 2020, Warden Zook stated to the inmates of F10 that "nobody cares about the prisons."

51.     On July 30, 2020, in a memo to the inmate population, Warden Zook announced that "inmates would no longer be tested for Covid-19." In the same memorandum, the Warden also stated that 10 days after an inmate tests positive for the virus, that inmate is considered recovered. But without further testing, those who remained sick would als remain unknown. Based on an article published in TIME magazine, June 22-29, 2020, "there are even hints that the virus may be causing silent damage." Studies show that lung-tissue damage is typical of Covid-19. Through deliberate indifference and gross negligence Warden Zoon hass likely caused permanent damage to every inmate, and staff, simply because she felt it unnecessary to plan for and/or adopt proper measures to prevent and mitigate the spread of Covid-19.

**FIRST AMENDED COMPLAINT**

## RULE 23 CLASS ACTION ALLEGATIONS

52.    Plaintiff bring this action pursuant to FED. R. CIV. P. 23(b)(3), on behalf of a class of inmates who are, or have been, incarcerated at FCI Seagoville from the beginning of the pandemic within the prison on April 1, 2020 until the present. All members of the class were those were subjected to Defendants' harmful policies that unnecessarily exposed inmates and exacerbated the harms of the COVID-19 pandemic within the prison, such that Defendants' actions violated the U.S. Constitution. All requirements of class certification are met by the proposed class.

53.    The named Plaintiffs seek to represent a Class that is defined as follows:

> All individuals incarcerated during the relevant time period who were unnecessarily exposed to COVID-19 or had the effects of COVID-19 infection worsened by the deliberate indifference of Defendants.

54.     The number of class members who have suffered from Defendants' violations of the U.S. Constitution, as set forth herein, are too numerous to join in a single action, necessitating class recognition. *See* FED. R. CIV. P.  23(a)(1).

55.    All questions relating to the Class's allegations under the U.S. Constitution share a common factual basis with those raised by the claims of Plaintiffs. The claims of Plaintiffs are typical of those asserted by the class members. *See* FED. R. CIV. P. 23(a)(3).

56.    Plaintiffs will fairly and adequately represent the interests of all members of the proposed class. *See* FED. R. CIV. P. 23(A)(4).

57.    Plaintiffs seek prospective injunctive relief so that the Class can obtain relief from dangerous policies adopted by FCI Seagoville leadership.

**FIRST AMENDED COMPLAINT**

12

58. A class action is superior to all other methods of adjudication and is necessary in order to fairly and completely litigate the Class's allegations that Defendants violated the U.S. Constitution by engaging in policies and practices that harmed a large number of inmates at FCI Seagoville.

59. The class members of the proposed Class are readily discernable and ascertainable. Contact information for all members of the proposed Class are readily available to Defendants through the prison's records at issue in this case. Notice of this class action can be provided by any means permissible under the Rule 23 requirements.

60. Plaintiffs assert these claims on their own behalf as well as on behalf of the Class Plaintiffs through their attorneys who are experienced in class action litigation as well as civil rights litigation.

61. Plaintiffs are able to fairly represent and properly protect the interests of the absent members of the proposed Class and have no interests conflicting with those of the proposed Class.

62. The public will benefit from this case being brought as a class action because it serves the interests of judicial economy by saving this Court's time and effort and by reducing a multitude of claims to a single litigation. Prosecution of separate actions by individual Class Plaintiffs creates a risk of varying results based on identical fact patterns as well as disposition of the Class's interests without their knowledge or contribution.

63. The questions of law and fact that are nearly identical for all class members make proceeding as a class action ideal. Without judicial resolution of the claims asserted on behalf of the proposed Class, continued violations of rights under the U.S. Constitution will undoubtedly continue as well as a continued, worsened public health crisis occurring in FCI Seagoville.

**FIRST AMENDED COMPLAINT**

13

**FIRST CAUSE OF ACTION**
Unconstitutional Conditions of Confinement in
Violation of the Eighth Amendment to the U.S. Constitution
*All Plaintiffs against All Defendants*
*28 U.S.C. § 1331*

64.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

65.    Plaintiffs bring this claim on behalf of the Class.

66.    The Eighth Amendment guarantees incarcerated persons the right to necessary and adequate medical care, and to be free from cruel and unusual punishment. *See* U.S. Const., amend. VIII. As part of that right, the government cannot subject incarcerated persons to a substantial risk of serious harm to their health and safety. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

67.    Plaintiffs at FCI Seagoville are unable to protect themselves from the spread of the virus. Defendants have not provided adequate protections. Further, Defendants have actively endangered Plaintiffs by refusing to separate infected inmates, requiring infected staff to work, and refusing to properly take basic protective precautions, among many other issues. As COVID-19 continues to spread, conditions at Seagoville have only gotten worse.

68.    Defendants are aware of these conditions. Defendants know of and have disregarded an excessive risk to health and safety.

69.    Defendants have failed to take reasonable steps, including the release of medically vulnerable persons or taking basic precautions regarding the spread of COVID-19, to mitigate these significant risks, which continuously subject Plaintiffs to a substantial risk of harm from serious illness, permanent injury, or death.

**FIRST AMENDED COMPLAINT**

14

70.    Defendants have also failed to provide adequate medical care and have taken affirmative steps to deny Plaintiffs access to necessary medical care, which further subjects Plaintiffs to a substantial risk of harm from serious illness, permanent injury, or death.

71.    Defendants' failure to protect Plaintiffs from these conditions by releasing prisoners and otherwise remedying the conditions of confinement constitutes deliberate indifference to the health, safety, and serious medical needs of Plaintiffs and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

72.    Federal courts have inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## JURY DEMAND

73.    Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request judgment against Defendants as follows:

A.  Enter a declaratory judgment that Defendants' policies and practices violate the Eighth Amendment right against cruel and unusual punishment with respect to the Class;

B.  Order Defendants to create and implement a mitigation plan for prevention of COVID-19 that is consistent with CDC guidelines, overseen by a qualified public health expert, and provides appropriate and reasonable accommodations to those with disabilities.

**FIRST AMENDED COMPLAINT**

15

C.  Order the Defendants to provide all necessary and appropriate health care consistent

to ensure that health care needs of individuals incarcerated at FCI Seagoville are

being met;

D.  Award Plaintiffs costs, expenses, and reasonable attorneys' fees; and

E.  Any further relief that this Court deems just, necessary, or appropriate.

Dated: December 9, 2020

Respectfully submitted,

*/s/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
Ellwanger Law LLLP
400 S. Zang Blvd. Ste. 1015
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile:  (737) 808-2262

Alison Grinter
Texas State Bar No. 24043476
alisongrinter@gmail.com
6738 Old Settlers Way
Dallas, Texas 75236
Telephone: (214) 704-6400

**FIRST AMENDED COMPLAINT**

16